# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD

| | |
|---|---|
| JOSHUA D. THORNBURY, | DOCKET NUMBER |
| Appellant, | DE-0752-14-0490-X-1 |
| v. | |
| DEPARTMENT OF VETERANS AFFAIRS, | DATE: June 29, 2022 |
| Agency. | |

## THIS ORDER IS NONPRECEDENTIAL[1]

Charles A. Shaw, Esquire, Prescott, Arizona, for the appellant.

Maxine N. Romero, Esquire, Phoenix, Arizona, for the agency.

### BEFORE

Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member
Tristan L. Leavitt, Member

### ORDER

¶1      This case is before the Board on the appellant's petition for enforcement filed on February 25, 2017. *Thornbury v. Department of Veterans Affairs*, MSPB Docket No. DE-0752-14-0490-C-1, Compliance File (CF), Tab 1. As discussed

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

below, we find the agency in noncompliance and order it to take appropriate steps to comply with the Board's Final Order.

## DISCUSSION OF ARGUMENTS AND EVIDENCE ON COMPLIANCE

¶2　　The final Board order in the underlying removal appeal directed the agency to pay the appellant back pay retroactive to June 27, 2014. *Thornbury v. Department of Veterans Affairs*, MSPB Docket No. DE-0752-14-0490-I-2, Appeal File (I-2 AF), Tab 18, Initial Decision at 14. The administrative judge issued a compliance initial decision finding the agency noncompliant with the Final Order. *Thornbury v. Department of Veterans Affairs*, MSPB Docket No. DE-0752-14-0490-C-2, Compliance File (C-2 CF), Tab 8, Compliance Initial Decision (CID); C-2 CF, Tab 11, Erratum to Compliance Initial Decision (Erratum). The compliance initial decision became final on March 20, 2018. CID at 6.

¶3　　The administrative judge informed the agency that, if it decided to take the actions ordered in the compliance initial decision, it must submit to the Clerk of the Board a narrative statement and evidence establishing compliance. CID at 5-7. In addition, he informed both parties that they could file a petition for review of the compliance initial decision if they disagreed with the findings therein. CID at 5-7. Neither party filed any submission with the Clerk of the Board within the time limit set forth in 5 C.F.R. § 1201.114. As such, pursuant to 5 C.F.R. § 1201.183(b)-(c), the administrative judge's findings of noncompliance became final, and the appellant's petition for enforcement was referred to the Board for a final decision on issues of compliance. *Thornbury v. Department of Veterans Affairs*, MSPB Docket No. DE-0752-14-0490-X-1, Compliance Referral File (CRF), Tab 1.

¶4　　On July 12, 2018, and April 12, 2019, the Clerk of the Board issued show cause orders directing the agency to provide evidence of compliance and a narrative explanation. CRF, Tabs 9, 20. In its responses to the Board's show cause orders, the agency explained that it made a series of pay adjustment errors that created overpayments. *See, e.g.*, CRF, Tab 14 at 6-7, Tab 22 at 4-7. The

agency states that although the removal action was effected on June 27, 2014, *see Thornbury v. Department of Veterans Affairs*, MSPB Docket No. DE-0752-14-0490-I-1, Initial Appeal File, Tab 5, Subtab 4a, at 11-13, it paid the appellant for an additional pay period after his removal, *see* CRF, Tab 22 at 4 (agency narrative), 34 (leave and earning statement for pay period (PP) 2014-13). To pay off this debt, the agency states that it withheld $372.57 from the appellant's tax refund and $463.88 from the payout of his annual leave and comp time. *Id.* at 4. This left a remaining debt of $416.35. *Id.* at 5. The agency mailed the appellant a letter on September 6, 2014, notifying him that he owed a debt of $416.35. *Id.* at 4-5.

¶5    According to the agency, the Defense Finance Accounting Service (DFAS) did not process the cancellation of the June 27, 2014 removal until January 9, 2015, even though the agency had promised to reinstate the appellant effective December 1, 2014. *See* I-2 AF, Tab 4 at 20 (letter from agency to the appellant dated November 25, 2014, directing the appellant to report for duty on December 1, 2014); I-2 AF, Tab 12 at 7 (prehearing submission stating that the appellant was reinstated on December 1, 2014); CRF, Tab 22 at 5 (stating that the removal was canceled on January 9, 2015). When the removal was canceled on January 9, 2015, DFAS restored the appellant's annual leave balance of 41.5 hours and comp time balance of 1.0 hours. CRF, Tab 22 at 5. According to the agency, this leave restoration created another debt in the amount of $673.47. *Id.* It does not appear that the agency explained these payroll errors to the appellant. *See* I-2 AF, Tab 4 at 22 (appellant's declaration, dated March 12, 2015, averring that as of that date he had not been contacted by the agency or DFAS about his reinstatement with status quo relief). Instead, the agency mailed the appellant a letter, dated January 24, 2015, notifying him that he owed a debt of $673.47 due to "Time and Attendance change(s)." I-2 AF, Tab 4 at 30 (letter from DFAS to appellant, dated Jan. 24, 2015); 35 (debt worksheet dated

January, 10, 2015, showing debts based on overpayments of $649.89 for "PA LSL ANNUAL" and $23.58 for "PS FPAY COMP").

¶6        On January 10, 2015, the agency paid the appellant the net amount of $309.00 for PP 2014-26.  CRF, Tab 14 at 12-13 (earnings and leave statement); CRF, Tab 22 at 5, 46-47.  This was not back pay, but rather pay for time worked after the appellant was reinstated on December 1, 2014.  Specifically, this was pay for the week of December 29, 2014, through January 2, 2015.  CRF, Tab 22 at 5.

¶7        On January 30, 2015, the agency paid the appellant the net amount of $11,035.36 in back pay.  I-2 AF, Tab 4 at 28 (leave and earnings statement).  The back pay included 1,040 hours from July 12, 2014, through December 27, 2014.  CRF, Tab 14 at 11, 13; CRF, Tab 22 at 5 (paragraph i), 47-48.  The back pay included 32 hours of holiday pay and 1 hour of comp time, although the agency did not explain how these hours were determined.  *Id.*  The agency deducted the outstanding debts of $416.35 and $673.47, giving the appellant an "adjusted" gross back pay of $15,721.28, which was further reduced to a net of $11,035.36 based on various deductions.  *Id.*

¶8        Subsequently, the agency states that DFAS discovered more errors.  Specifically, DFAS determined that the appellant was not paid for a full 80 hours for PP 2014-13 and PP 2014-14.  CRF, Tab 22 at 6 (paragraph p).  The agency states that DFAS "paid out the missing $1,089.82 retro funds," *id.*, but there is no evidence of such a payment or of interest on such a payment.  The appellant avers that he did not receive any payments after January 2015.  CRF, Tab 18 at 61.

¶9        On April 18, 2015, the agency states that it processed a retroactive within-grade increase (WIGI) effective on June 29, 2014, and which increased the appellant's salary from $32,683 to $34,074 on that date.  CRF, Tab 22 at 6 (paragraphs l and r), 52-53.  According to the agency, it issued the appellant a payment for this adjustment in the amount of $546.72 ($470.81 after deductions) on April 18, 2015.  CRF, Tab 22 at 52-53.  The agency states that this retroactive

action was in error. CRF, Tab 22 at 6 (paragraph r). "This created a debt of $546.72 which was collected from the retro funds." *Id.* The appellant avers that he did not receive the April 18, 2015 payment. CRF, Tab 18 at 61.

¶10 Pursuant to 5 U.S.C. § 1204(a)(2), the Board has jurisdiction to consider an appellant's claim of agency noncompliance with a Board order. *Kerr v. National Endowment for the Arts*, 726 F.2d 730, 733 (Fed. Cir. 1984). The agency bears the burden of proving that it has complied. 5 C.F.R. § 1201.183(d). *See Spates v. United States Postal Service*, 70 M.S.P.R. 438, 441 (1996). An agency's assertions of compliance must include a clear explanation of its compliance actions supported by understandable documentary evidence. *Vaughan v. Department of Agriculture*, 116 M.S.P.R. 319, ¶ 5 (2011).

The Agency Must Reimburse the Appellant for $552.44 Tax Refund Offset

¶11 On February 18, 2017, the agency sent the appellant a letter notifying him that he had a "delinquent debt" of $478.58. CRF, Tab 18 at 64. This letter, as with the previous letters, did not clearly explain the source of the debt. Instead, it warned that "[i]f we do not hear from you, we will report your debt to the U.S. Department of the Treasury for the Treasury Offset Program (TOP)" and that the appellant would be responsible for "any and all fees associated with the offset program." *Id.* On March 7, 2018, the Department of Treasury notified the appellant that it had offset a debt of $552.44 from his tax refund. *Id.* at 63. The appellant seeks reimbursement for this amount. CRF, Tab 18 at 32, Tab 23 at 14-16.

¶12 In the show cause order issued by the Clerk of the Board on April 12, 2019, the agency was directed to explain "whether the agency created a debt that was deducted from the appellant's tax refund, whether that debt was legitimate, and if not, whether the debt has been canceled and the appellant reimbursed." CRF, Tab 20 at 2. In response to the order, the agency denied that the offset was related to a debt that it created and instead suggested that the $552.44 might have

been collected on behalf of a different agency or as a court-ordered garnishment. CRF, Tab 22 at 8. This assertion is in direct conflict with the evidence provided by the appellant. The Department of the Treasury's offset notice explicitly states—under the heading "Who Do I Owe?"—that it applied the offset to the debt that the appellant owed to the agency, which it identifies as "Prescott VAMC 649." CRF, Tab 18 at 63. We find, based on the agency's notice to the appellant that it would collect the debt through the Treasury Offset Program, *id.* at 64, and the subsequent notice from the Department of Treasury that the debt had, indeed, been collected through that program and sent to the agency, *id.* at 63, that the agency collected an unsubstantiated debt of $552.44 from the appellant's tax refund. Accordingly, the agency must reimburse the appellant in the amount of $552.44, plus applicable interest.

<u>The Agency Must Effectuate the Appellant's Within-Grade Increase</u>

¶13        The record evidence supports a finding that the appellant should have received a WIGI, effective on November 2, 2014, increasing his salary from General Schedule (GS) 5, step 2, to GS-5, step 3, i.e., from $32,683 to $33,738. CRF, Tab 22 at 5 (paragraph j), 49-50. The appellant's prior WIGI, from GS-5, step 1, to GS-5, step 2, occurred on October 20, 2013. CRF, Tab 14 at 12 (leave and earnings statement showing salary of $32,683 and last WIGI on October 20, 2013). Therefore, he was entitled to a WIGI from GS-5, step 2, to GS-5, step 3, 52 weeks later, on October 20, 2014. *See* 5 U.S.C. § 5335(a)(1) (providing that a GS employee, subject to certain conditions, shall receive an increase from step 2 to step 3 after 52 weeks). Because October 20, 2014 fell within the middle of PP 2014-21, it should have taken effect on the first day of PP 2014-22, i.e., November 2, 2014. *See* 5 C.F.R. § 531.412(a) (stating that a WIGI shall be effective on the first day of the first pay period following completion of the required waiting period and in compliance with the conditions of eligibility). The agency's evidence, however, shows that it processed the appellant's pay at GS-5,

step 2 for PP 2014-22 through PP 2014-26. *See* CRF, Tab 22 at 42-46. Therefore, the appellant is entitled to the difference between step 2 and step 3 pay for those five pay periods, i.e., PP 2014-22, PP 2014-23, PP 2014-24, PP 2014-25, and PP 2014-26, along with applicable interest.[2]

The Agency Owes Back Pay for January 5, 2015

¶14    The appellant asserts that the agency erred by ending the back pay period on January 2, 2015, given that the notice of his second removal was not served on him by that date and he did not receive a copy until one was provided by his attorney on January 9, 2015. *See* I-2 AF, Tab 4 at 25 (declaration of appellant), 64 (postmark indicating that the agency mailed its removal decision to the appellant's attorney on January 5, 2015). The appellant states that he continued to report for duty until Monday, January 5, 2015, "when he was told by an agency employee not to return to work the following day." I-2, AF, Tab 1 at 5.

¶15    In its response to the petition for enforcement, the agency stated that the appellant was on "constructive notice" from the notice of proposed removal that he "could be removed," and that on January 2, 2015, "the agency effectuated his removal and Appellant was told the removal was effectuated." CF, Tab 4 at 4. However, constructive notice, or notice of a proposed action, is not sufficient under the applicable regulations. The agency was required to "deliver the notice of decision to the employee on or before the effective date of the action." 5 C.F.R. § 752.404(g)(2). *Cf. Loui v. Merit Systems Protection Board*, 25 F.3d 1011, 1014 (Fed. Cir. 1994) (holding that, for purposes of determining when the time period for appeal begins in cases in which the stated effective date in a removal notice is earlier than the date of delivery of the removal notice, the date

---

[2] We note that the agency states that it retroactively processed the WIGI effective November 16, 2014, and made a correction payment to the appellant in the amount of $153.27 on March 21, 2015. *See* CRF, Tab 22 at 5 (paragraph j), 49-50. However, the agency has not provided proof of this payment, and the appellant avers that he did not receive it. CRF, Tab 18 at 61.

of delivery must be considered to be the effective date). The agency has provided no evidence that the removal decision was served on the appellant on or before January 2, 2015.

¶16    Subsequently, the parties agreed that the appellant would be paid for January 5, 2015. CF, Tab 7 at 6-7. The agency states that it "processed" payment in the amount of $129.36. CRF, Tab 22 at 6 (paragraph q). The only evidence of this payment, however, is a DFAS remedy ticket that has a handwritten notation that it was paid on March 12, 2018. CRF, Tab 14 at 25. Moreover, it appears that the $129.36 may have been applied to various debts created by agency processing errors. *See* CRF, Tab 22 at 6-7. The agency states that the appellant was ultimately paid $49.36 during PP 2018-04. *See* CRF, Tab 14 at 18, 25, Tab 22 at 58. In a sworn declaration, however, the appellant avers that he did not receive any payments from the agency after January 2015. CRF, Tab 18 at 21, 61 (declaration at ¶ 3). He asserts that he is owed $130.64 for January 5, 2015, based on his hourly rate of $16.33 for this time period multiplied by 8 hours. CRF, Tab 23 at 12. Given the absence of any explanation of how the agency computed the pay for January 5, 2015, and its lack of proof of payment, we find that the agency owes the appellant payment for January 5, 2015, in the amount of $130.64, plus applicable interest.

The Agency Owes the Appellant Additional Holiday Pay

¶17    An appellant's entitlement to holiday back pay is computed using the same principles applied to overtime back pay.[3] *See Blanchard v. Department of Justice*, 40 M.S.P.R. 513, 516 (1989). Overtime back pay may be computed based on either pre-removal overtime history or average overtime hours worked by similarly-situated employees during the removal period. *Johnson v. U.S. Postal Service*, 71 M.S.P.R. 303, 306 (1996). Here, the agency's methodology is

---

[3] We note that the appellant has not contested the agency's computation of his overtime back pay.

not clear.   The January 24, 2015 (PP 2015-01) back pay included 32 hours of holiday pay in the amount of $501.12, i.e., $15.66 per hour.  *See* I-2 AF, Tab 4 at 28; CRF, Tab 14 at 11, 13, 23; CRF, Tab 23 at 21.  The appellant's pay for his last week of work, PP 2014-26, did not include holiday pay for January 1, 2015.  *See* CRF, Tab 14 at 12-13, Tab 22 at 46-47.

¶18    The agency states that it later learned that the appellant should have been paid for Labor Day 2014, Veterans Day 2014, and New Year's Day 2015, and that he was not paid for those three holidays because the agency's "corrected timecards" did not show that the appellant worked on those holidays.  CRF, Tab 22 at 7.  The agency indicates that if the appellant were paid for these holidays, he would be owed $379.92, plus interest in the amount of $55.27 (based on payment during PP 2018-08).

¶19    The appellant states that he should be paid at the rate of $16.33 per hour for all three holidays because he received a WIGI from GS-5, step 2, to GS-5, step 3, effective June 29, 2014.  CRF, Tab 23 at 9.  As discussed above, however, the evidence shows that the appellant's WIGI should have been effective on November 2, 2014, and that the June 29, 2014 date was an error by the agency.  *See* CRF, Tab 22 at 6 (paragraphs l and r).  We conclude that the appellant is owed holiday pay at the $15.66 rate for Labor Day 2014, and Veterans Day 2014, for a total of $250.56, and at the $16.33 rate for New Year's Day 2015, for a total of $130.64.  Thus, the agency owes the appellant $381.20 for holiday pay, plus applicable interest.

The Agency Must Compensate the Appellant for his Annual Leave

¶20    The appellant has consistently alleged that he did not receive reimbursement for 97.5 hours of annual leave.  *See, e.g.*, I-2 AF, Tab 4 at 10, 28; CF, Tab 1 at 5, 39; CRF, Tab 18 at 6 n.2, 12-13.  At the hearing on April 15, 2015, an agency human resources representative testified that if the then-ongoing audits at the agency showed that the appellant had not been compensated for his

accrued leave, he would be. I-2 AF Tab 18 at 5. She stated that the agency planned to remedy these issues within 30-60 days of the hearing. *Id.*

¶21     Initially, the agency stated that the appellant was paid $1,511.90 for 97.5 hours on April 10, 2015. CRF, Tab 14 at 11, 15. The agency later provided a leave and earning statement that listed a sum of $1,511.90 for annual leave and $23.58 for 1 hour of comp time. CRF, Tab 22 at 51-52. According to the agency, the payment of $23.58 created yet another debt because it had already paid the appellant for comp time in its January 24, 2015 payment. CRF, Tab 22 at 5-6 (paragraph k). The agency mailed the appellant a letter notifying him of this debt on April 18, 2015. *Id.* at 6. In any event, the agency's evidence shows that the appellant actually received a net payment of "$.00" on April 10, 2015. *Id.* at 51. This is consistent with the appellant's declaration that he did not receive any payments from the agency after January 2015. CRF, Tab 18 at 21, 61 (declaration at ¶ 3).

¶22     The appellant states that he accrued 192 hours of leave between his date of hire on October 21, 2012, and January 2, 2015, and that the agency previously agreed to pay him for those hours following an audit. CRF, Tab 23 at 10-12. There is nothing in the record to substantiate the claim that the appellant accrued 192, rather than 97.5, hours of annual leave. Furthermore, whatever the agency promised in the settlement agreement appears to have been contingent on its audit. *See* CF, Tab 7 at 7. There is no audit report in the record that supports 192 hours. We therefore conclude that the agency owes the appellant for 97.5 hours of annual leave, plus applicable interest. The agency's computation of the appellant's compensation for annual leave should take into account that the appellant was due a WIGI to GS-5, step 3, effective PP 2014-22.

The Agency Must Reimburse the Appellant for his FEHB Withholdings

¶23     The agency states that it refunded the appellant's withholdings for the Federal Employees' Health Benefits (FEHB) program in the amount of $2,664.74

on April 16, 2015.  CRF, Tab 22 at 6 (paragraph m).  The agency's evidence shows payment of $2,664.74 on May 2, 2015, during PP 2015-08.  CRF, Tab 14 at 17, Tab 22 at 53-54.  The appellant responds that "[i]f, in fact, these premiums were refunded, they were not paid to [the appellant], and [the agency] has offered no proof or evidence that they were ever 'refunded' or 'paid' to [the appellant]." CRF, Tab 23 at 14.  The appellant includes a declaration in which he avers, under penalty of perjury, that he never received a check or electronic funds transfer for his unreimbursed FEHB premiums.  *Id.* at 19-20 (declaration, paragraphs 2 & 3). In light of the appellant's declaration, and in the absence of any proof of payment by the agency, we conclude that the agency still owes the appellant $2,664.74 for his unreimbursed FEHB premiums, with applicable interest.

The Agency Owes Interest on Back Pay

¶24    The Back Pay Act provides that back pay "shall be payable with interest" and states that the interest shall be computed at the overpayment rate set forth in the Internal Revenue Code at 26 U.S.C. § 6621(a)(1).  5 U.S.C. § 5596(b)(2).  In a hearing before the administrative judge on April 15, 2015, an agency human resources representative testified that "the agency agrees that it did not pay the appellant the required interest on his back pay."  I-2 AF Tab 18 at 5.  The administrative judge, in his compliance initial decision, found that it was undisputed that the agency had not paid the interest due.  Erratum at 1-2.  After the case was forwarded to the Board, the Clerk issued two orders directing the agency to show cause that it had properly calculated and paid interest on back pay.  CRF, Tab 9, Tab 20.

¶25    In its first response, the agency stated:

As noted in the CFO's memorandum, the calculation of the interest and interest on interest had to be broken into three separate calculations because of erroneous SF-50's that had been submitted and then corrected at different points in time. This document was one of three calculations made to resolve the settlement payments. One was paid by [Electronic Funds Transfer (EFT)] to the bank in March

of 2018, the remaining two portions were issued as a check from DFAS and mailed to the address on the settlement agreement documents.

CRF, Tab 14 at 7.

¶26    The agency states that it processed interest on the $15,721.28 gross back pay that it paid on January 24, 2015, and computed the amount of interest at $99.52, as well as interest on that interest in the amount of $11.32, for a total of $110.84.  CRF, Tab 14 at 21-22, Tab 22 at 6.  The interest rate was 3 percent.  CRF, Tab 22 at 60.  The agency states that it also processed the third amount of interest, which it computed to be in the amount of $144.38.  CRF, Tab 14 at 25; CRF, Tab 22 at 6 (paragraph t). While the agency's first response stated that the interest payments were made by EFT and then by two separate checks mailed to the appellant, CRF, Tab 14 at 7, the second response indicates that the agency made one payment of the total of $255.22 in interest ($110.84 + $144.28) on March 3, 2018, during pay period 2018-04.  CRF, Tab 22 at 57-58.

¶27    In any event, the appellant states that he did not receive this payment, and the agency has not provided any proof of payment.  CRF, Tab 23 at 16, 19-20.  Citing concern about further delay, the appellant states that he "prefers to accept the agency's computation of $255.22 and add a rough estimate of $100.00 more, for total back pay interest to be awarded in the amount of $355.22."  CRF, Tab 23 at 16-17.  We find that the agency owes the appellant $255.22 in interest, plus interest on that interest and on the additional payments discussed herein.  With respect to the appellant's proposal of limiting additional interest to $100, we note that the parties are free to come to an agreement on the additional interest owed so that compliance can be expedited.  In the absence of such an agreement, however, we do not have a basis to award the appellant the specific amount of $100.00.

**ORDER**

¶28     Accordingly, the agency is ORDERED, **within 30 calendar days**, to pay the appellant $552.44 to reimburse him for the offset from his tax refund; $130.64 as back pay for January 5, 2015; $381.21 for holiday pay; $2,664.74 for unreimbursed FEHB premiums; and $255.22 for back pay interest; **for a total amount of $3,984.25**.   In addition, the agency must pay the appellant the difference between GS-5, step 2 pay and GS-5, step 3 pay for Pay Periods 2014-22 through 2014-26.   The agency also must compensate the appellant for 97.5 hours of annual leave, taking into account that the appellant was due a WIGI to GS-5, step 3, effective PP 2014-22.   The agency must pay the appellant applicable interest on all of these payments.   The agency must submit a narrative explanation and documentary evidence of its interest calculations, as well as documentary evidence of a check or electronic payment made to the appellant.

¶29     If satisfactory evidence of compliance is not received, the Board will impose sanctions, pursuant to 5 U.S.C. § 1204(a)(2) and (e)(2)(A) and 5 C.F.R. § 1201.183, against **Shannon Wasielewski**, Chief Financial Officer, Northern Arizona VA Health Care Systems, as the responsible agency official.

**NOTICE TO THE APPELLANT**

Following the agency's submission of evidence, you may respond **no later than 21 calendar days** after the date shown on the agency's certificate of service.   The response may be filed electronically through https://e-appeal.mspb.gov/, by facsimile to (202) 653-7130, or by mail to:

Clerk of the Board
Merit Systems Protection Board
1615 M Street NW
Washington, DC  20419

Any response must be served on the agency and proof of such service provided to the Board. If you do not respond, the Board may assume you are satisfied and dismiss the petition for enforcement as moot.[4]

FOR THE BOARD: _____/s/ for_____

Jennifer Everling
Acting Clerk of the Board

Washington, D.C.

---

[4] When the Board issues a final decision or order in this compliance matter, the appellant may file a motion for attorney fees with the Board's Denver Field Office. *See* 5 C.F.R. § 1201.203(c).